UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------x
UNITED STATES OF AMERICA,

    -against-                             MEMORANDUM AND ORDER
                                              10 - CR - 0759

Julio AGUILAR,

                    Defendant.

---------------------------------------------------x

GLASSER, United States Senior District Judge

## Introduction

A one-count indictment charges Julio Aguilar ("Aguilar" or "Defendant") with being an illegal alien in possession of two firearms in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2). Before this Court is Aguilar's motion to suppress the two firearms as the fruit of an illegal search. The Court held an evidentiary hearing on Aguilar's motion on January 28, 2011. The evidence adduced at the hearing is as follows.

## Background

On September 9, 2010, a team of approximately eight agents from the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), went to 4120 Eighth Avenue in Brooklyn, NY, after receiving information that a target of

1

their investigation, Salvador Garcia ("Garcia"), could possibly be at that location in apartment 2R. (TR. McClellan, p. 3-5.) The raid was part of a larger investigation called "Organization Community Shield," looking for targets that were suspected or known illegal aliens who were also connected to gang activity. (Id. at 3.) The ICE agents arrived at 4120 Eighth Avenue at approximately 6:30 A.M. and proceeded to apartment 2R with photographs of Garcia in hand in their attempt to find him. (Id. at 5.) The agents knocked on the door of that apartment and were invited by the occupants into the kitchen, which was right inside the door. (Id. at 6.) The agents showed the occupants the photographs, asking them whether they had seen Garcia. (Id.) The occupants indicated that they had not. (See id.) Agent McClellan suggested that the agents visit the other apartments in the building, and he and Agent DiFillipo proceeded up to apartment 3R. (Id. at 6.) The weapons the agents were carrying were holstered and not visible. The two agents knocked on the door of apartment 3R. (Id.) The Defendant, Julio Aguilar, opened the door. (Id. at 7.) Agent McClellan testified that he showed Aguilar the picture of Garcia and asked him if he "knew this man," to which Aguilar responded "no." (Id.) Instead of ending the encounter at that point, Agent McClellan then asked Aguilar if he could "come inside and talk to him." (Id. at 7-8.) He testified that Aguilar responded "yes" and then opened the door fully, stepping back and allowing the two agents into a kitchen area adjacent to the entrance. (Id. at 8, 41.) Agent McClellan also testified that they entered the apartment to seek information about Salvador Garcia's whereabouts, and also to determine whether he was in fact in apartment 3R. (Id. at 39.) After the agents entered the apartment, they noticed another man, Ray Silverio, who also lived in apartment 3R, standing in the kitchen next to

2

Aguilar. (Id. at 9.) Agent McClellan asked Aguilar if anyone else lived in the apartment, to which Aguilar responded "yes." (Id.) At that point, Agent McClellan testified that he asked Aguilar, "[d]o you mind if I take a look around?" and Aguilar responded "no" and pointed down the hallway. (Id. at 9, 44.) The two agents then walked down the hallway in which there were three bedroom doors, one to the left, one to the right, and one straight ahead, which was Aguilar's bedroom. The door to Aguilar's bedroom was open, and the two agents "walked into that room to see if there were any other people in the room." (Id. at 10.) As Agent DiFillipo entered, he noticed a dresser drawer that was open a few inches with the butt of a handgun plainly in view. (Id. at 12.) He did not seize the gun but alerted the other agents of it and asked them to obtain Aguilar's consent to a full search of the bedroom. (Id. at 14-15.) Agent Lynda Echegowyen, one of the eight on the team who speaks Spanish, translated a consent to search form which Aguilar knowingly and voluntarily signed. (TR, Echegowyen, p. 46., Defs. Motion to Suppress, Ex. C.) After Agent McClellan was informed that the consent to search was obtained, he and other agents undertook a full search of Aguilar's bedroom. From the dresser drawer the agents recovered two handguns—both fully loaded and ready to fire—as well as a box of ammunition, a small amount of a white powdery substance, and a bowl full of blue glassine bags typically used to hold narcotics. (TR. McClellan, p. 14-16.) They also recovered other drug paraphernalia on a shelf next to Aguilar's bed. (Id. at 17-18.)

The designated case agent for this operation, Agent Schoonhan, was still on the floor below when Agents McClellan and DiFillipo entered Aguilar's apartment. (TR.

3

Schoonhan, p. 59-60.)  In his report of the investigation, Agent Schoonhan stated that the authority for the agents' initial entrance into Aguilar's bedroom after entering the apartment was a "security sweep," not that it was conducted pursuant to Aguilar's consent to look around.  (Id. at 70.)  Additionally, the report states that the guns were discovered in plain view during this "security sweep."  (Id.)

Aguilar states in his affidavit that he neither consented to the agents entering his apartment, nor to their search of his bedroom.  (Decl. of Julio Aguilar, Dec. 22, 2010.)  He also avers that when the agents gave him the Consent to Search form to sign they did not translate it for him, but instead told him that it had to do with his deportation.  (Id.)  Aguilar's assertions directly contradict the testimony of Agents McClellan and Echegowyen, and thus this motion to suppress the evidence as a violation of the Fourth Amendment of the Constitution.  Aguilar also argues, in the alternative, that even if he did consent to the ICE Agents entering his apartment, their subsequent "protective sweep following a consensual entry is probably unreasonable and illegal."  (Defs. Motion to Suppress, p. 6.)  The government, in turn, argues that the agents obtained Aguilar's consent to enter, consent to perform a protective sweep, and finally consent to a full search, making all of their actions legal.  Because the Court ultimately finds the testimony of Agents McClellan and Echegowyen credible, the Court first turns to the issue of the legality of the so-called "protective sweep."  The issue here is whether the agents performed their initial search of the apartment on the basis of a "protective sweep," or whether they obtained Aguilar's voluntary consent to look around.

4

**Discussion**

The government acknowledges that "[it] is mindful of the Second Circuit's admonition that 'protective sweeps' may not be proper absent ... specific and articulable facts to support a determination that reasonable suspicion exists that the area harbors a danger." (Gov. Mem. of Law. p. 7)  A "protective sweep" is a "quick and limited search of premises ... narrowly confined to a cursory visual inspection of those places in which a person might be hiding," as defined by the Supreme Court in Maryland v. Buie.  494 U.S. 325, 327 (U.S. 1990).  The Court in Buie applied the Fourth Amendment reasonableness test and found the protective sweep to be permissible in cases where officers are executing an arrest warrant and have a reasonable suspicion, based on specific and articulable facts, that "the area swept harbored an individual posing a danger to the officer or others."  Id. at 327.  The Second Circuit extended Buie to include situations where officers enter premises under lawful process, such as an order of protection.  United States v. Miller, 430 F.3d 93 (2d Cir. 2005).  A circuit split exists regarding the proper bases for a protective sweep when officers enter a home without a warrant.  The Second Circuit has not decided whether Buie extends to situations where officers enter a home for reasons other than to effectuate lawful process, for example, cases where officers enter a dwelling pursuant to consent. In United States v. Hassock, 681 F.3d 79, 87 (2d Cir. 2011), where the officers undertook a full search rather than a protective sweep without a warrant, without consent, or exigent circumstances or even probable cause to believe that Hassock, the object of their search was even present, the court nevertheless believed it appropriate to write:

> [a]lthough we have joined the majority of our sister circuits to the extent that they conclude that specific, articulable facts giving rise to a reasonable inference of danger may justify a protective sweep in circumstances other than during the in-home execution of an arrest warrant we have done so only in a case where officers entered a home under lawful process, in that case an order of protection.

(internal quotations omitted); United States v. Gandia, 424 F.3d 255 (2d Cir. 2005); United Sates v. Moran Vargas, 376 F.3d 112 (2d Cir. 2004). The Second Circuit has found protective sweeps—conducted after officers entered a dwelling based on consent—to be unreasonable when the officers had neither consent nor a reasonable suspicion, based on "specific and articulable facts" to conduct a protective sweep. See id. at 86.

United States v. Gandia, 2004 WL 1396164 (S.D.N.Y. June 18, 2004), is instructive. In that case, officers responded to a report of a dispute involving a firearm between a building superintendent and a tenant. The person suspected of possessing the firearm fit the description of Gandia, who, a frisk established did not have a gun on his person. (Id. at *1.) After taking a statement from the superintendent, the officers asked Gandia if they could go to his apartment to discuss the matter further with him because it was raining and because they wanted to separate him from the superintendent. (Id.) Gandia consented. The first room the officers entered was a kitchen which opened to the living room through a door frame. (Id. at *2.) While Gandia was speaking one of officers positioned himself just inside the living room and noticed a bullet on the top shelf of a home entertainment center in that room. (Id.) After examining the bullet, the officer looked into Gandia's bedroom to see whether there was any safety threat. Gandia was then arrested and thereafter a warrant was

6

obtained to search the apartment, which yielded a handgun and 160 rounds of ammunition. (Id. at *3.) Gandia moved, pursuant to the Fourth Amendment, to suppress the physical evidence seized. (Id.) He argued that because the officers were not in his apartment to arrest him they had neither right nor reason to conduct a protective sweep. Therefore, he contended that the warrant was obtained based on the bullet discovered during an unconstitutional search of his apartment and was tainted by it. (Id.)

The government argued in opposition that the bullet was lawfully discovered in plain view during a brief protective sweep. (Id.) After reviewing the testimony in its entirety, the district court found an objective basis for a reasonable suspicion of a risk to the officers' safety that justified their limited protective sweep. (Id. at *4.) Gandia's motion to suppress was denied in United States v. Gandia, 2004 WL 1396164 (S.D.N.Y. June 18, 2004).

On appeal, the Second Circuit, in 424 F.3d 255, acknowledged the absence of a consensus among the circuit courts as whether Maryland v. Buie, 494 U.S. 325 (1990) was expanded to authorize protective sweeps even when officers have not entered a suspect's home pursuant to an arrest warrant and did not decide the issue. It did note, however, that when officers gained entry to a suspect's home by consent, "there is a concern that generously construing Buie will enable and encourage officers to obtain that consent as a pretext for conducting a warrantless search of the home."[1] Gandia, 424

---

[1] It is interesting to note that three years later, in the same case, responding to the defendant's argument that the officers had an improper motive, i.e., pretext, for entering the room, the court wrote in United States v. Gandia, 276 Fed.Appx. 10, 12, 2008 WL 1925064 (2d Cir. 2008), "the officer's subjective motive is not grounds for suppression. "[T]he fact that the officer does not have the state of mind ... which [would] provide the legal justification for the officer's action does not

7

F.3d at 262. Following a thorough review of the then existing state of the law and of the facts of the case, the court noted that:

> the officers never explicitly asked for permission to search Gandia's apartment and that Gandia did not explicitly grant such permission. The government argues, however, that by not objecting to [Officer] Morales moving into the living room, Gandia impliedly consented for the police to go there. . . . The district court did not reach the issue of consent to a search in ruling on Gandia's motion to suppress. And the record in its present state is not sufficient to permit us to consider and decide the issue in the first instance. We therefore remand for the district court to . . . make additional factual findings and conclude whether Gandia consented to the police officers' entering other rooms of his apartment.

Id. at 265.

On remand, the district court conducted an evidentiary hearing on the issue of consent. In an Order dated May 2, 2006, the district court again denied Gandia's motion to suppress. See Gandia v. United States, 2011 WL 182124 at *2 (S.D.N.Y. Jan. 10, 2011). Once again, Gandia appealed that denial. The Court of Appeals, in a Summary Order, affirmed. In 276 Fed.Appx. 10, 2008 WL 1925064 (2d Cir. 2008), the court wrote:

> With regard to the motion to suppress, the district court on remand found that Gandia gave implicit consent to the officer entering the doorway of the living room. The district court also found that from this position, the officer was able to see the evidence Gandia sought to suppress, a bullet, sitting in plain view. Because the police had permission to enter the doorway and the bullet was in plain view, the district court again denied Gandia's motion.
>
> . . . .
>
> Upon review of the record, we conclude that the district court did not err in denying the motion. Viewed in the light most favorable to the

---

invalidate the action taken as long as the circumstances, viewed objectively, justify that action." (quoting Scott v. United States, 436 U.S. 128, 138 (1978)).

> government, there was sufficient evidence in the record to support the district court's factual determinations that Gandia gave his implicit consent to the officer entering the doorway and that the bullet was in plain view from that position.

276 Fed.Appx. at 12.

The facts in this case mirror, virtually precisely, the facts in <u>Gandia</u>, and even more so. After evaluating the testimony of Agents McClellan and Echegowyen, observing their demeanor and viewing the evidence as a whole, the Court finds their testimony entirely credible. Aguilar explicitly consented to the agents' request to look around and to enter the bedroom. The gun the agents saw there was in plain view, but not then seized. It did, however, prompt the obtaining of a written consent to search pursuant to which the evidence sought to be suppressed was seized. Agent Echegowyen testified that after being advised by her in Spanish of what he was requested to sign, the Defendant, knowingly and voluntarily did so. The search and seizure to which the defendant consented thus did not offend the Fourth Amendment, and the motion to suppress is hereby DENIED.

SO ORDERED.

Dated:  Brooklyn, New York
        March 8, 2011

/s/

I. Leo Glasser
United States Senior District Judge

Copies of the foregoing memorandum and order were electronically sent to:

<u>Counsel for the United States of America</u>

Jason Allen Jones
United States Attorneys Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201-1820

<u>Counsel for the Defendant</u>

Douglas G. Morris
Federal Defenders of New York, Inc.
16 Court Street
Brooklyn, NY 11201-4859